```
 1                IN THE UNITED STATES DISTRICT COURT

 2               FOR THE SOUTHERN DISTRICT OF TEXAS

 3                       HOUSTON DIVISION

 4   UNITED STATES OF AMERICA

 5

 6   VS.                              August 28, 2023
                                      Houston, Texas
 7                                    1:09 p.m.

 8   DERRICK BUTLER,                  4:23-cr-0358-1
     TREVON MAXWELL,                  4:23-cr-0358-2
 9   HERMAN MITCHELL,                 4:23-cr-0358-4
     JEREMY JENKINS                   4:23-cr-0358-6
10

11

12

                            DETENTION HEARING
13
              BEFORE THE HONORABLE ANDREW M. EDISON
14
                  UNITED STATES MAGISTRATE JUDGE
15
     APPEARANCES:
16
     For the United States           Ralph Paradiso, AUSA
17                                    U. S. Attorney's Office
                                      1000 Louisiana
18                                    Suite 2300
                                      Houston, Texas 77002
19
     For Defendant Butler            Joseph Francis Vinas
20                                    Vinas and Graham, PLLC
                                      1210 W. Clay Street
21                                    Suite 12
                                      Houston, Texas 77019
22
     For Defendant Maxwell           R. Trent Gaither
23                                    Law Office of
                                        Trent Gaither
24                                    6602 Westview Drive
                                      Houston, Texas 77055
25
     Proceedings from official electronic sound recording;
     transcript produced by court approved transcriber.

     DIGITAL SCROLL TRANSCRIPTION                    281.382.9862
```

2

```
 1   For Defendant Mitchell              David B. Adler
                                         David Adler, Attorney
 2                                       1415 North Loop West
                                         Suite 905
 3                                       Houston, Texas 77008

 4   For Defendant Jenkins              Raymundo Vazquez
                                         Law Office of
 5                                          Ray Vasquez
                                         405 Main Street
 6                                       Suite 751
                                         Houston, Texas 77002
 7
     Case Manager                        Ruben Castro
 8
     Electronic Recording Operator       Brandis Isom
 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1                              INDEX

2                                                   Page

3    WITNESS FOR THE GOVERNMENT:

4        Proffer by Mr. Paradiso                    11

5        Detective Adam Bock                        18

6            Cross Examination by Mr. Adler         18
             Cross Examination by Mr. Vazquez       30
7            Cross Examination by Mr. Vinas         35

8            [Re]direct Examination by Mr. Paradiso 41
             Recross Examination by Mr. Vazquez     46
9            Recross Examination by Mr. Vinas       48

10       Proffer by Mr. Adler                       49
         Proffer by Mr. Vazquez                     50
11       Proffer by Mr. Vinas                       52

12   EXHIBITS:

13
         Exhibit 1        Jenkins Pretrial Report    9
14       Exhibit 2        Maxwell Pretrial Report    9
         Exhibit 3        Mitchell Pretrial Report   9
15       Exhibit 4        Butler Pretrial Report    10

16   ARGUMENT:

17       By Mr. Paradiso                            55
18       By Mr. Vazquez                             57
         By Mr. Vinas                               60
19       By Mr. Adler                               71

20   COURT RULING                                   76

21

22

23

24

25

4

1            THE COURT:  United States versus Derrick DeWayne

2   Butler, Travon Maxwell, Herman Mitchell and Jeremy James

3   Jenkins.

4              Could I get introductions, starting with the

5   Government?

6            MR. PARADISO:  Yes, Your Honor.  Ralph Paradiso for

7   the United States.

8            THE COURT:  Good to see you, sir.

9              On behalf of the Defendants?

10             Let's start with Mr. Butler.

11           MR. VINAS:  Joe Vinas for Mr. Butler.

12             Good afternoon, Your Honor.

13           THE COURT:  Good to see you.

14             Mr. Maxwell?

15           MR. GAITHER:  Trent Gaither for Mr. Maxwell, Your

16   Honor.

17           THE COURT:  Hello, Mr. Gaither.

18             Mr. Mitchell?

19           MR. ADLER:  David Adler for Mr. Mitchell, Your Honor.

20           THE COURT:  Hello, Mr. Adler.

21             And Mr. Jenkins?

22           MR. VAZQUEZ:  Ray Vazquez on behalf of Mr. Jenkins,

23   Judge.

24           THE COURT:  Hello, Mr. Vazquez.

25             And hello, Mr. Butler, Mr. Maxwell, Mr. Mitchell

1   and Mr. Jenkins.

2          DEFENDANT BUTLER:  How you doing?

3          DEFENDANT MAXWELL:  How you doing?

4          DEFENDANT MITCHELL:  How you doing?

5          DEFENDANT JENKINS:  How you doing, Judge?

6          THE COURT:  We're here today for – a couple of

7   things – first, we have Arraignment – and by the way, before I

8   go any further, since my understanding this is the first

9   appearance of both the Government and Defense counsel in the

10  case, let me follow the Federal Rules of Criminal Procedure,

11  Rule 5(f), which requires me to inform counsel for the

12  Government of your obligation to comply with the Disclosure

13  responsibilities set forth in the United States Supreme

14  Court's landmark case of Brady v. Maryland and its progeny.

15          Failure to do so, as you're well aware, may

16  result in sanctions, contempt proceedings, exclusion of

17  evidence, dismissal of charges and adverse jury instructions.

18          I'll enter a formal written order that says the

19  exact same thing, because the Rules require me to do so, and

20  I'll do that later today.

21          The next thing we need to address is an

22  Arraignment.  And let me see if I can get the agreement of –

23  well, let me find out from all counsel, at least with respect

24  to the Arraignment part – have you had an opportunity to

25  review the charges with your clients?  Are they prepared to

1  enter a not guilty plea at this time?  And are you willing to

2  waive a formal reading of the charges?

3            Let me start with – let me just name the

4  Defendant, and if the lawyers could chime in –

5            With respect to Mr. Butler?

6      MR. VINAS:  We reviewed these – got a copy of the

7  Indictment.  We will waive formal reading, and he is prepared

8  to enter a not guilty plea, Your Honor.

9      THE COURT:  Thank you.

10            Mr. Maxwell?

11      MR. GAITHER:  Yes, to all of the above, Judge.

12      THE COURT:  Mr. Mitchell?

13      MR. ADLER:  Yes, Your Honor, for all these things.

14      THE COURT:  And, Mr. Jenkins?

15      MR. VAZQUEZ:  Same, Your Honor, we would agree to

16  waive it.

17      THE COURT:  Okay.

18            And now, let me just ask each of you,

19  gentlemen – and I'm required to ask you – so, let me start

20  with Mr. Butler.

21            Have you had an opportunity to review the

22  charges set forth in the Indictment with your attorney, and

23  are you prepared to enter a not guilty plea at this time, sir?

24      DEFENDANT BUTLER:  Yes, sir.

25      THE COURT:  Okay.

1                   Mr. Maxwell, let me ask you.

2                   Have you had an opportunity to review the

3    charges with your attorney set forth in the Indictment, and

4    are you prepared to enter a not guilty plea at this time?

5               DEFENDANT MAXWELL:  Yes, sir.

6               THE COURT:  Mr. Mitchell, same questions for you.

7                   Have you had an opportunity to review the

8    charges with your attorney, Mr. Adler, and are you prepared to

9    enter a not guilty plea?

10              DEFENDANT MITCHELL:  Yes, sir.

11              THE COURT:  And, Mr. Jenkins, have you had an

12   opportunity to review the charges with Mr. Vazquez, and are

13   you prepared to enter a not guilty plea at this time?

14              DEFENDANT JENKINS:  Yes, sir.

15              THE COURT:  Okay.

16                  A not guilty plea is entered on behalf of all of

17   you in connection with this case.

18                  This case has been assigned to Judge

19   Lee Rosenthal.  I'm going to enter a Scheduling Order that

20   will govern the proceedings in this case.  This case will be

21   set for a trial on October 30th, at 9:00 a.m.  There will be a

22   Pretrial Conference on October 23rd, at 8:45 a.m.; October 16th

23   will be responses to motions.  Motions will be filed on

24   October 2nd.

25                  Let me ask the Government.

1          How long do you expect the trial of this case to

2   last?

3          MR. PARADISO:  Your Honor, the Government would

4   estimate about a week trial on the Government's side.

5          THE COURT:  Okay.

6          So, obviously, all proceedings after today will

7   be before Judge Rosenthal, and if anyone wants, as you're well

8   aware, to change that schedule talk to her.

9          Okay.  The next issue is the Detention Hearing.

10          Is the Government prepared to proceed?

11          MR. PARADISO:  Yes, Your Honor.

12          THE COURT:  With respect to each Defendant, are you

13   prepared to proceed, or do you want a continuance to the

14   Detention Hearing.

15          Let me start with respect to Mr. Butler.

16          MR. VINAS:  We're ready, Your Honor.

17          THE COURT:  Okay.

18          Mr. Maxwell?

19          MR. GAITHER:  We are not ready, Your Honor.  We would

20   ask for a continuance.

21          THE COURT:  Okay.

22          Let me address you in one second, Mr. Gaither.

23          Mr. Mitchell?

24          MR. ADLER:  We are ready to proceed, Your Honor.

25          THE COURT:  And, Mr. Jenkins?

1          MR. VAZQUEZ:  Ready to proceed, Judge.

2          THE COURT:  Okay.

3               Mr. Gaither, my view is, I'm always going to

4    give a defendant additional time if they need to prepare for a

5    Detention Hearing.

6               So, why don't we do this?  Let's – here's my

7    thought process.

8               We're going to have a proffer from the

9    Government, if we could.  If you would listen to the proffer,

10   we'll sort of knock that out; we'll get that out of the way.

11   And then, once that proffer is offered by the Government, then

12   your portion of the Detention Hearing we're going to

13   continue – at what time did I say – 1:30?

14               1:30 on Wednesday.

15          MR. ADLER:  That's 1:30 on Wednesday?

16          THE COURT:  1:30 on Wednesday, and when we resume the

17   Detention Hearing with respect to Mr. Maxwell, you'll be able

18   to cross examine the – the Agent – in other words, the proffer

19   will have already been given.  You'll hear it now, but then,

20   you'll go in and be able to cross examine the Agent.

21               And I'm going to offer each part- -- each

22   Defendant's Pretrial Report.  In fact, I'm going to do that

23   right now, just so the record –

24               Mr. Jenkins' Pretrial Report is going to be

25   Exhibit 1; Mr. Maxwell's Exhibit 2; Mr. Mitchell's No. 3 and

1   Mr. Butler's Exhibit 4 to this – to this hearing.

2           Does that work, Mr. Gaither?

3           MR. GAITHER:  Yes, that's – that is just wonderful,

4   Judge.

5           THE COURT:  Okay.

6           MR. GAITHER:  Appreciate it.

7           THE COURT:  Thank you very much.

8           Okay.  So, who is the witness on behalf of the

9   Government?

10          MR. PARADISO:  Yes, Your Honor, the Government will

11  offer Federal Bureau of Investigation Taskforce Officer

12  Adam Bock for Cross Examination.

13          THE COURT:  Okay.

14          And if – obviously, as you know, Mr. Bock, if

15  you will listen closely to the proffer that's about to be

16  given.  Once the proffer is done, I'll swear you in, ask if

17  you adopt the proffer as your testimony under penalty of

18  perjury.  If there are any corrections, additions,

19  subtractions, please make them.  I want to make sure your

20  proffer is a hundred percent true, correct and accurate, and

21  then, I'll turn it over to cross examination from the Defense

22  lawyers.

23          AGENT BOCK:  Yes, sir.

24          THE COURT:  With that said, I'll let the Government

25  proceed.

1      MR. PARADISO:  Thank you, Your Honor.

2           Your Honor, the FBI was conducting a

3   investigation into a criminal street gang known as the Early

4   Boys Scoot-up Gang (phonetic), and during their investigation,

5   they became aware that Defendant Maxwell was involved in drug

6   rips and robberies of rival gang members.

7           On or about July 24th, 2023, the FBI made

8   contact with the Defendant Maxwell through a Confidential

9   Human Source.  That Confidential Human Source informed Maxwell

10  that she had inside information into a large shipment of

11  cocaine coming to Houston that was being delivered by a

12  Mexican drug trafficking organization.

13          She stated that she had an inside source that

14  would let them know how many persons would be at that

15  location, the weapons they would have and the amount of

16  cocaine that would be available.

17          Later on the Source told Maxwell that there

18  would be approximately a 122 kilograms of cocaine at this

19  undisclosed location at that time.  Maxwell provided his phone

20  number to the CHS, and who can later contact him once she knew

21  where the location would be.

22          On or about July 26, 2023, Confidential Human

23  Source contacted Maxwell and told him that there would be

24  about three vehicles bringing cocaine to this delivery

25  location here in Houston.  At that time it was determined that

1    the crew would meet at a Residence Inn in Houston, Texas.

2                      Maxwell indicated that his crew would steal the

3    cocaine, and they would retain a 100 kilograms of the cocaine,

4    but they would give CH- -- the CHS 22 kilograms.

5                      Law enforcement placed video and audio

6    surveillance in the meeting room at the Residence Inn.  And

7    then, on or about July 27, 2023, Defendants Maxwell, a

8    fugitive Defendant and Butler and another unidentified

9    individual arrived at the hotel.

10                     They went into the room, and in that room they

11   discuss the upcoming robbery of the Mexican drug cartel, and

12   at that point the CHS contacted another CHS who is posing as

13   the inside source in the Mexican drug cartel.

14                     The inside – the inside source texted back to

15   the group and telling them where the 122 kilograms of cocaine

16   was located, which was going to be in an abandoned house and

17   in an abandoned golf course, located at 16019 Clay Road,

18   Houston, Texas, which is located in the Southern District of

19   Texas.

20                     They were informed that the gate was going to be

21   unlocked, and at that time they were going to still be five

22   persons at that location.  They were told the drugs were going

23   to be under a gray tarp in the building and advised that

24   people at the target location were about to leave.  Butler

25   asked if the location had burglar alarms or cameras, and he

1  was told it did not.  He went on to say that he would kill the

2  N word's ass if he has to do so.

3              The group was provided photographs and the

4  address of the location.

5              The group then discussed how to conduct the

6  operation to steal the cocaine and whether they should do

7  reconnaissance of the target location before trying to rob it.

8  Butler stated that they will take the license plates off their

9  cars and use duct tape to put paper in its place.

10             Butler says that the people hitting the location

11 will smoke them and do what has to be done.  They discussed

12 the robbery, and that the other participants would be arriving

13 soon.

14             On any audio recording in the hotel room, an

15 unidentified person can be heard saying, "They have guns and

16 masks, and are going to make money."

17             Butler tells the other three individuals that he

18 came with to go to the store to buy duct tape, which they do.

19 Surveillance video taken from that convenient store shows the

20 individuals shoplifting the duct tape.

21             In the hotel room, Butler is still there with

22 the CHS, and he asks, if she knew anything about guns and

23 showed her a handgun, in which Butler said is a hellcat

24 9 millimeter.  He said that the gun never failed him, and he

25 takes it on a million missions.  He further stated this is my

1 shit, and I can rob a lot of N words with this bitch.  At that

2 time he placed the handgun into a sling that he was wearing at

3 that time.

4         Shortly thereafter, the other three individuals

5 returned from the store.  Only one unidentified individual

6 went in the room, and Maxwell and a fugitive remained outside.

7 At that time Butler asked him, the CHS, to provide him the

8 information that they received from the resou- -- the inside

9 source on the target location, and she did so.

10         Residence Inn hotel surveillance showed one of

11 the individuals attempting to remove the license plate from a

12 red Camry and replace it with duct tape.  However, it appears

13 someone within that car tells him not to do it, and he takes

14 the paper off.

15         Prior to depart- -- departing the hotel, law

16 enforcement observed various individuals changing their

17 clothes or adding clothing, such as hoodies, to disguise their

18 appearance for wanting to make entry into the target location.

19 They then loaded into their respective vehicles to depart.

20         As they were doing this, HPD Gang Officers, who

21 are familiar with the subjects are able to recognize and

22 identify them by who's getting into what vehicle – into and

23 out of the vehicles.

24         At approximately 11:40 a.m., the targets load

25 into four vehicles to head to the target location, which is

1  the pump house at the abandoned golf course to conduct the

2  drug robbery.  Male 1 got into a Hyundai Sonata, and he was

3  the only occupant.

4             Maxwell, who was the driver; a fugitive, who was

5  the front passenger; Mitchell, who was the rear passenger and

6  Male 2 got into a rear driver side – who got into the rear

7  driver side entered a red Toyota Camry.  Draper and Jenkins

8  entered a gray Dodge Charger.

9             However, prior to departing the hotel, Jenkins

10  got out of the – the Mitsubishi Outlander with an– sorry – got

11  out of the Mitsubi- -- got out of the Dodge Charger and got

12  into the Mitsubishi Outlander with Butler.  At that point, all

13  four vehicles depart the Residence Inn heading towards the

14  golf course.

15             Butler's Outlander was in the lead followed by

16  Draper's Charger, Maxwell's Camry and Male 1's Hyundai.

17  Aerial surveillance video recorded the convoy as it headed

18  towards the Res- -- from the Residence Inn to the target

19  location.

20             When they arrived at the target location,

21  Draper's Charger pulled into a 7-Eleven across the street, and

22  he reversed into a parking lot so that that allowed him to

23  have a view of the target location.

24             Butler's Outlander and Maxwell's Camry drove

25  pass the target location, and Male 1 stopped at the gate.  He

1    got out of the vehicle and opened it.  While he was working to

2    open it, Butler and Maxwell's vehicles drove back and forth,

3    up and down the road waiting for entry.

4              Once Male 1 opened the door, he got into his

5    vehicle and pulled the vehicle inside the front of the gate.

6    Once it opened, Butler's Outlander pulled next to Draper's

7    Charger at the 7-Eleven.

8              Jenkins got out of the Outlander and got into

9    the Charger.  Maxwell's Camry drove through the gate, towards

10   the pump house, and he stops short of the pump house.

11             The four individuals in the vehicle got out.

12   They were wearing masks, gloves and other clothing to disguise

13   their appearance.  However, as stated before, law enforcement

14   was able to identify them based on the clothing that they had

15   on and what they were wearing at the Residence Inn.

16             Maxwell, the Fugitive, Mitchell and Male 2 began

17   to make entry into the building.  Video surveillance in the

18   building showed the individuals entered the building armed and

19   they began to search through the cocaine.  They advanced on

20   the pump house and kicked in the door.  When they are entered,

21   they possessed long guns and handguns with extended magazines.

22   They conduct a sweep of the location and a tactical search.

23   They searched under the gray tarp where they thought the

24   cocaine was and did not find any.

25             At about the time the four persons were entering

1  the target location, Draper's Charge- -- left the sear- --

2  Draper's Charger with Jenkins in it left the 7-Eleven and

3  entered the par- -- property.  However, the Charger stopped

4  before reaching the pump house.

5                    Shortly thereafter, the Camry and Charger

6  leave the target location at a high rate of speed.  All four

7  vehicles left the golf course going north on Highway 6.  They

8  then did what was known as heat runs, in other words, vehicles

9  move in to detect law enforcement surveillance in various

10  neighborhoods before turning back and heading to - back to the

11  Southeast Houston.  They did not return to the Residence Inn

12  as previously discussed.

13                    HPD officers were to later stop Draper's vehicle

14  for a traffic stop.  He was - Draper was removed from the

15  vehicle, and he was patted down.  Jenkins was not removed from

16  the vehicle.  The vehicle was not searched, and the two were

17  allowed to depart.

18                    That's all, Your Honor.

19              THE COURT:  Okay.

20                    Thank you very much.

21                    Agent Bock, if you would take the witness stand,

22  please.

23                    If you would, raise your right hand, sir.

24      (Witness sworn by Court.)

25              AGENT BOCK:  I do swear.

1        THE COURT:  Please be seated.

2            And let me ask you, to start off, you heard the

3    proffer that was made by counsel.  Do you adopt that proffer

4    as your testimony here today under penalty of perjury, sir?

5        THE WITNESS:  I do, Judge.

6        THE COURT:  Okay.

7            Thank you very much.

8            I'll turn it over to the Defendants, in no

9    particular order.

10        MR. ADLER:  Judge, I'm going to start with this

11   witness.

12        THE COURT:  Mr. Adler is standing up, so please

13   proceed.

14        DETECTIVE ADAM BOCK, GOVERNMENT'S WITNESS, SWORN

15                    CROSS EXAMINATION

16   BY MR. ADLER:

17   Q   Is it Agent Mitch- -- Agent Bock?

18   A   It's Taskforce Officer or Detective.

19   Q   Okay.

20            So, who was your actual employer?

21   A   I'm employed by the Houston Police Department.

22   Q   Okay.

23            And how long have you been with HPD?

24   A   Fifteen years.

25   Q   And before that were you employed with any law enforcement

DIGITAL SCROLL TRANSCRIPTION                    281.382.9862

1   organizations?

2   A   I was not.

3   Q   Were you in the military before that?

4   A   I was.

5   Q   Okay.  Who were you with?

6   A   The Army.

7   Q   And how many years in the Army?

8   A   Six, technically.  Some of that was Reserve time.

9   Q   Okay.

10          And what did – what was your MOS, your job

11  responsibilities in the Reserves?

12  A   So, I was a border observant for the field artillery.  And

13  then, I was cross trained as a door gunner on a Black Hawk.

14  Q   Okay.  No law enforcement, though?

15  A   No, sir.

16  Q   And I assume you went through the HPD Academy?

17  A   I did.

18  Q   Okay.

19          And when did you first start working with the

20  FBI on a task- -- on any taskforce?

21  A   Uh, that wa- --

22  Q   Is this the first?

23  A   It – this is technically the second.  I believe it was

24  October 2018, I believe.

25  Q   Okay.

20

1   A    About five years.

2   Q    And so, what other positions have you had with HPD?

3   A    Currently, I'm assigned in the Gang Division.  Prior to

4   that, I was a Homicide Detective on the Gang Murder Squad.

5   Prior to that, I was also at the Gang Division working

6   transnational crime.

7                    Prior to that assignment, I was in the Northeast

8   Division on a Divisional Gang Unit.  Prior to that, also at

9   the Northeast Division on a Tactical Unit.  Prior to that, at

10  Northeast on the Gang Taskforce; prior to that was patrol.

11  Q    Okay.

12                   And – I'm sorry – but your last name is spelled

13  B-O-C-K?

14  A    Just like the beer, yes, sir.

15  Q    Okay.

16                   And are you reviewing any notes up there with

17  your testimony today?

18  A    Only the – only the proffers as read.

19            MR. ADLER:  Could I just review that momentarily,

20  Judge?

21            THE COURT:  Sure.

22       (Pause in the proceedings.)

23            MR. ADLER:  Thank you, Judge.

24  BY MR. ADLER:

25  Q    Officer – is it Officer Bock?

1    A    Detective.

2    Q    Detective – I'm sorry.

3                Detective Bock, I think you'll be the only

4    witness testimony testifying for the Government today,

5    correct?

6    A    Yes, sir.

7    Q    So – and you know the Judge is going to make his decisions

8    today based on your testimony and your credibility, correct?

9    A    Yes.

10   Q    So, with that in mind, can you tell us if you've had any

11   kind of disciplinary issues while you've been with HPD or in

12   the military?

13              MR. PARADISO:  Your Honor, I object at this time.

14   Any of that would go through an ex parte hearing.

15              THE COURT:  Overruled.

16   BY MR. ADLER:

17   Q    Did you understand the question?

18   A    Yes.  I have not received any – any penalties or – I have

19   received complaints at the Houston Police Department.  They

20   have been either unfounded or – what is the other one?

21   Q    I understand.

22   A    Okay.

23   Q    Can you tell us, generally, what the complaints were; what

24   kind of complaints have been filed against you?

25   A    Misconducts and excessive force.

1  Q   And about how many of those complaints were filed against

2  you?

3  A   I – more than four.  I don't – it was just a long time

4  ago.  I don't –

5  Q   Okay.

6  A   -- remember.

7  Q   Okay.  Thank you.

8            I'm – I apologize in advance if some of my

9  questions kind of stoop at the – the AUSA was reading, and we

10 were scribbling notes as quickly as we can.  So, I apologize

11 for that.

12 A   Yes, sir.

13 Q   The long and the short of it is you have a CHS who is

14 talking with an individual; this discussion comes up about a

15 drug rip, if you will, a drug robbery.  And then, there's a

16 meeting at a hotel; is that correct?

17 A   Yes.

18 Q   Was Mr. Mitchell at that meeting?

19 A   The initial one?

20 Q   The hotel meeting?  I'm pretty sure he was not at – I'll

21 ask you that in a second – but the hotel meeting?

22 A   I – I believe there were two.  There were two meetings.

23            Give me a second.

24 Q   Sure.

25    (Pause in the proceedings.)

1        THE WITNESS:  I don't believe he was inside of the –

2  the hotel room.

3  BY MR. ADLER:

4  Q   Okay.  And what was the date of that meeting at the hotel

5  room?

6            I thought I had it as the 26th?

7  A   It's –

8        MR. PARADISO:  July 27th, the date of the incident.

9        THE WITNESS:  The 26th was the initial – I think –

10  time when they decided where the meet would be.

11  BY MR. ADLER:

12  Q   Okay.

13  A   So, July 27th was the date of the meeting.

14  Q   Okay.

15            Was Mr. Mitchell at the 26th meeting?

16  A   No, sir.

17  Q   And he wasn't at the 27th meeting?

18  A   I – he didn't – wasn't inside of the room, not necessarily

19  that he wasn't in the parking lot.

20  Q   Okay.  Where was he on the 27th?

21  A   I – I – well, at a certain point he was – here on this –

22  on the meeting?

23  Q   Right.  When the meeting is going at the hotel, where was

24  Mr. Mitchell?

25  A   I'm not sure.

1    Q    Okay.  Tell the Judge every single piece of evidence you

2    have that Mr. Mitchell was at that hotel vicinity during that

3    meeting.

4    A    I don't have that prepared to respond.

5    Q    So, you don't have any information for this Judge

6    whatsoever today that Mr. Mitchell was at that hotel during

7    that meeting?

8    A    No.

9    Q    Okay.

10               The individuals are observed –

11   A    I'm sorry.  Let me correct that.

12               Yes, because all the vehicles were being

13   surveilled.  At the points that the vehicles left the – the

14   hotel and arrived at the – at the robbery location, he was

15   seen there, so by logic he had to have been – when a pit stop

16   is made, he had to have been at – at the hotel.

17   Q    Well, let me follow up on that.

18               I think you said when they arrived at the scene

19   of the supposed robbery they were all wearing masks?

20   A    I apologize.

21               So, Mr. Mitchell was seen at – at the hotel,

22   because we were able to figure out who they were at the hotel

23   time because of what – well, for Mr. Mitchell in particular

24   this is unique first off.

25   Q    Okay.  So, who observed Mr. Mitchell at the hotel?

1    A    Officers with the HPD Gang Units.

2    Q    And what are their names that observed – the ones that

3    observed Mr. Mitchell?

4    A    I don't know currently at this time.

5    Q    How did they observe Mr. Mitchell?  Where was he when they

6    observed him?

7    A    He was inside of the room.

8    Q    Okay.  So, he's recorded on video tape inside the room?

9    A    I would presume based on that, yes.

10   Q    I don't want your presumption; I want your testimony.

11   Does it say anything in the proffer about Mr. Mitchell being

12   in that room?

13   A    It does not say in this proffer.

14            THE COURT:  Okay.  I'm totally confused.

15                Under oath, was he in the room?  Yes or no?

16            THE WITNESS:  I – I believe he was, but –

17            THE COURT:  That wasn't question.  Yes or no was he

18   in the room?  Do you know?

19            THE WITNESS:  I don't.

20            THE COURT:  Okay.

21            MR. ADLER:  Thank you.

22   BY MR. ADLER:

23   Q    So, if you don't know whether he was in the room and then

24   you see – or your fellow officer see individuals wearing masks

25   at the golf course location, you're just guessing that one of

1  those individuals in the masks was Mr. Mitchell, correct?

2  A   Now, at some point he wasn't wearing a mask.

3  Q   Okay.  What point was that?

4  A   So – the clothing was the same.  He had been seen in the

5  vicinity of the hotel or in the room –

6  Q   But I thought you just said you don't if he was in the –

7          THE COURT:  Hold – hold – hold on.  Hold – hold on.

8  Hold on.

9             Was he seen in the hotel room?  Yes or no?  Or I

10  don't know?

11          THE WITNESS:  I – I don't know.

12          THE COURT:  Okay.

13             Was he seen in the vicinity of the hotel?  Yes

14  or no, or I don't know?

15          THE WITNESS:  I don't know.

16          THE COURT:  Okay.

17          MR. ADLER:  Can I continue?

18          THE COURT:  Yep.

19  BY MR. ADLER:

20  Q   So, you don't know if he's at the hotel or not.  And then

21  the individuals at the golf course are all wearing masks,

22  correct?

23  A   Correct.

24  Q   So, you're assuming that one of those individuals in the

25  masks was Mr. Mitchell, right?

27

1  A    Correct.

2  Q    But you, by your own admission can't figure out how he got

3  to that place, if, in fact, it was Mr. Mitchell, because he

4  wasn't observed at the hotel, or you don't know if he was at

5  the hotel?

6  A    So, I – I do not know if he was at the hotel.  I – I was

7  debriefed on these,  I was not present during the events.

8  This information was presented to a grand jury, so I know this

9  to be true.  I just – there's been a couple of these.  I

10  cannot specifically remember –

11  Q    I get it.

12  A    -- from this one.

13  Q    I get it.

14           But let's be honest.  What's presented to a

15  grand jury is not necessarily true.  It's just the grand jury

16  decides whether or not the case should precede, right?

17  A    I – I disagree.  That's – it's perjury if it wasn't true.

18  Q    Okay.  Who was the Officer that testified at the grand

19  jury?

20  A    Colton Peverill.

21  Q    I'm sorry.  Could you give me that name again?

22  A    Colton Peverill with HPD.

23  Q    How do you spell the last name?

24  A    P-E-V-E-R-I-L-L.

25  Q    Okay.

1              Do you know anything about his disciplinary

2   history at HPD?

3              MR. PARADISO:  Objection, Your Honor.  This goes way

4   outside the scope of this hearing.

5              THE COURT:  I'm – I'm going to give both sides a lot

6   of leniency, so.

7                   Overruled.

8   BY MR. ADLER:

9   Q   Do you know anything about Officer or Detective

10  Peverill's –

11  A   I don't.

12  Q   Okay.

13              And certainly, in your career you've heard of

14  false testimony being provided to grand juries, right?

15  A   No.

16  Q   Never heard of that?

17  A   I haven't.

18  Q   Impossible.

19  A   I didn't say it was impossible; I just said I haven't

20  heard of it.

21  Q   Okay.

22              So, somebody told you that Mr. Mitchell was

23  there at the hotel?

24  A   I also reviewed the video, because all of it was recorded.

25  I just at this time do not specifically remember whether he

1    was in the room or not.

2    Q    Okay.  But obviously, you would agree with me that's a

3    pretty critical fact for this hearing today?

4    A    I don't think it's critical for this hearing, because he's

5    already been indicted.  I think that this hearing is critical

6    to determine whether or not he is a danger to the community.

7    Q    Okay.  And you understand that one of the factors that

8    this Court considers is the weight of the evidence, right?

9    A    Correct.

10   Q    So, whether he's in that room or not would go to the

11   weight of the evidence.  You would agree with me on that,

12   right?

13   A    Sure.

14   Q    Okay.

15              Were you present when my client was arrested?

16   A    I was not.

17   Q    Okay.  Do you know any information at all about what

18   happened when he was arrested?

19   A    Very little.

20   Q    Okay.

21              That's all I have at this time, Your Honor.

22              THE COURT:  Okay.

23              Anything from the Government?

24              Actually, from the other Defendants?

25              Too quick deal.

```
 1              MR VAZQUEZ:  Mr. –

 2              THE COURT:  Mr. Vazquez?

 3              MR. VAZQUEZ:  I'll go, Judge.

 4                      CROSS EXAMINATION

 5  BY MR. VAZQUEZ:

 6  Q   Detective Bock, so there were four people present at the

 7  hotel meeting, correct?

 8  A   (No audible response.)

 9              THE COURT:  Let me ask it a different way, because I

10  want to make sure I understand it.

11                  Who was at the hotel meeting?

12              THE WITNESS:  It was Travon Maxwell, Fugitive,

13  Derrick Butler and another individual.

14  BY MR. VAZQUEZ:

15  Q   That's an unidentified individual, correct?

16  A   I believe so – Male 1.

17  Q   Okay.

18                  Was Mr. Jenkins in that meeting?

19  A   I do not –

20  Q   Or –

21  A   I do not believe so.

22  Q   Okay.

23                  So, no, he was not there, correct?

24  A   I – I do not believe so.

25  Q   According to the proffer, he wasn't at that meeting,
```

1  correct?

2  A   So, the proffer doesn't say "he wasn't."  The proffer just

3  states he was.

4  Q   Okay.

5  A   So, I do not know for sure.

6  Q   Okay.

7          And according to the proffer, it was Butler and

8  Maxwell that were basically running the show, correct?

9  A   Yes.

10  Q   And who were the three individuals that went to the

11  convenience store according to the proffer?

12  A   It would be the Fugitive, Maxwell and a – I don't remember

13  his name – another individual.

14  Q   So, not Mr. Jenkins?

15  A   Correct.

16  Q   And then, it goes on to say that Mr. Jenkins is seen

17  getting into a Dodge, correct?

18  A   Yes.

19  Q   Where was – where did that happen at?

20  A   At the hotel.

21  Q   Are you sure about that?  That's what the proffer says?

22  A   Yes.

23  Q   Okay.  But you weren't present, correct?

24  A   I was not.

25  Q   So, you're just relying on other officers' information?

1   A    That's correct.

2   Q    Okay.  And then, he's seen getting out of the Dodge and

3   getting into a Mitsubishi?

4   A    Yes.

5   Q    And then, that Mitsubishi is followed, drives pass the

6   target location, goes to the 7-Eleven, correct?

7   A    I don't think I offered that the – that the Mitsubishi

8   went to the 7-Eleven.

9   Q    Well, at some point, according to the proffer, Mr. Jenkins

10  gets out of a car, the car he was in, and gets in the Charger

11  at the 7-Eleven, correct?

12  A    Correct.

13  Q    So, the car he was in was a Mitsubishi; obviously, it had

14  to go to the 7-Eleven?

15  A    Makes sense.

16  Q    Okay.

17              So, it goes to the 7-Eleven; Mr. Jenkins gets

18  out and gets in the Charger?

19  A    Correct.

20  Q    Okay.

21              Where – and it doesn't say at any point the

22  Charger went into the target location, except for later on,

23  correct?

24  A    After the – what I would assume the initial clearing – it

25  then drove on the property towards the target location.

1  Q    Did anybody get out at that point?

2  A    I do not believe so.

3  Q    Then, they stop short of the pump house, left, correct?

4  A    Yes.

5  Q    Okay.

6              And then, eventually they were stopped by HPD?

7  A    Yes.

8  Q    And that was Mr. Draper and Mr. Jenkins, correct?

9  A    Yes.

10  Q    And they were released from the scene, correct?

11  A    That's correct.

12  Q    To your knowledge, did they have any weapons on them?

13  A    Not to my know- -- well, not to my knowledge, no.

14  Q    And the vehicle was not searched, correct?

15  A    That's correct.

16  Q    So, really, all Jenkins did, according to the proffer, was

17  get out of one car into another, which drove onto the

18  property, and then left?

19  A    No.

20          THE COURT:  What – what did Jenkins do?

21          THE WITNESS:  So, Jenkins – well, he entered into a

22  vehicle that then drove in a convoy to go do a robbery, drove

23  back and forth in front of the location, waited for his co-

24  Defendants to open the location, go inside and engage any

25  individuals that would be at the location.

1              He then drove onto the property, at which point

2    in an operation like this someone would then load up

3    narcotics, since they were expecting a 122 kilograms of

4    cocaine.  And then, upon finding none, they then did the

5    surveillance detection routes to avoid law enforcement before

6    driving back to their area of town.

7           THE COURT:  Did he ever get out of the car on the

8    property?

9           THE WITNESS:  I - I - I don't believe so.

10   BY MR. VAZQUEZ:

11   Q   Okay.  So that - so you're just speculating what he was

12   doing based on what - your experience, correct?

13   A   I think that's a reasonable belief.

14   Q   Well, reasonable belief and evidence are two different

15   things; are they not?

16   A   A - a belief is based on evidence.

17   Q   Okay.  And the evidence here is, he gets out of one car;

18   he gets into another car, sits at the 7-Eleven, drives onto

19   the location, leaves the location; according to you, drives

20   around, gets stopped by HPD, is released by HPD and then goes

21   home?

22   A   Yes.

23          MR. VAZQUEZ:  Nothing further, Judge.

24          MR. VINAS:  May I proceed, Your Honor?

25          THE COURT:  You bet.

```
 1                        CROSS EXAMINATION
 2   BY MR. VINAS:
 3   Q   Okay.  Detective Bock, let me start with that traffic
 4   stop.
 5                 Who were the – who were the occupants of the
 6   vehicle?
 7   A   It was Draper and Jenkins.
 8   Q   Who was the driver?
 9   A   I believe it was Draper.
10   Q   Do you know what traffic offense they were pulled over
11   for?
12   A   I don't.
13   Q   And that doesn't appear in any report you've reviewed?
14   A   No.
15   Q   Most likely under Texas Transportation Code an arrestable
16   offense?
17   A   I – I don't know.
18   Q   Well, there's only two –
19   A   That's correct.
20   Q   -- non- -- non-arrestable offenses in the Texas
21   Transportation Code, correct?
22   A   That's correct.  However, our policies are a little bit
23   different.
24   Q   I understand.
25                 But those two non-arrestable offenses are
```

36

1    speeding and open container of an alcoholic beverage, correct?

2    A    Yes.

3    Q    Everything else you can - expired inspection sticker you

4    can arrest somebody?

5    A    Again, that's not what our policy states; it's what the

6    Texas law states.

7    Q    Okay.  Well, I'll rephrase it that way.

8                   Under the law, for an expired registration, you

9    can arrest somebody?

10   A    Under the law, yes.

11   Q    Okay.  Or failure to signal a lane change, same.  Under

12   the law, you could arrest them, right?

13   A    Uh-huh.

14   Q    Correct?

15   A    Yes.

16   Q    Okay.

17                  All right.  Just remember you got to be audible

18   for the record.

19                  So, just probability says it's an arrestable

20   offense more likely than not that Mr. Draper was pulled over?

21   A    Well, it- -- I mean, it's also assuming that the reason

22   for the traffic stop was because of a traffic violation.

23   Q    Well, what was the reason for the traffic stop?

24   A    I - I don't know, but it would make perfect sense if it

25   was a reasonable suspicion stop following the events that had

1  occurred.

2  Q   Okay.  Well, good point.

3                The pump house that the gas they – or – excuse

4  me – at the golf course was that audio video recorded?

5  A   It was.

6  Q   So, it was more than reasonable suspicion at that point.

7  You had probable cause of several crimes going on?

8  A   Knowing what the investigative team knew at that point, I

9  can't speculate as to whether they knew everyone's identities

10  or everybody's roles at that point.  So, I don't know if it

11  would have been enough to on-the-spot arrest them for probable

12  cause or not.

13  Q   Okay.  Did they ever lose site of the vehicle that they

14  stopped with Draper and Jenkins in it from the time it left

15  the golf course to the traffic stop?

16  A   I don't believe so based on my recollection, but I – I

17  don't know for sure, because we were utilizing aerial

18  surveillance as well.

19  Q   Did they – do you know if those officers asked for consent

20  to search the vehicle?

21  A   I don't know.

22  Q   So, at that point – on what day was this – July 27th?

23  A   Yes.

24  Q   So, on July 27th, 2023, Officers had at least reasonable

25  suspicion that Mr. Jenkins and Mr. Draper had just conducted

1    an armed robbery, correct?

2    A   Or had participated in one, yes.

3    Q   Sure.

4                  And possibly he had evidence of that armed

5    robbery in that vehicle?

6    A   Okay.

7    Q   Correct?

8    A   Yes.

9    Q   And decided not to search it, correct?

10   A   Yes.

11   Q   And let Mr. Jenkins and Mr. Draper go?

12   A   Yes.

13   Q   And when were Mr. Jenkins and Mr. Draper arrested?

14         MR. PARADISO:  Your Honor, I'm going to object.  I

15   don't know what this goes to the Detention Hearing here today.

16         MR. VINAS:  Well, if they were a danger to the

17   community, the police should not have released them on that

18   scene, after they had them detained.

19         THE COURT:  Objection overruled.

20   BY MR. VINAS:

21   Q   Again, were they arrested – Mr. Jenkins and Mr. Draper?

22   A   They were arrested this past Thursday, the 24th, I

23   believe.

24   Q   So, just shy of 30 days after the fact?

25   A   Yes.

1   Q    Who drafted the – the arrest warrants?  Was that you?

2   A    They were – they were indicted.  So, the arrest warrants

3   were just from the Magistrate.

4   Q    So, direct to the grand jury and then once the Indictment

5   happened, the warrants ensued?

6   A    Correct.

7   Q    Okay.

8             Now, let's go back to the pump house.

9             What vehicle did you testify that Mr. Butler was

10  in?

11  A    The Mitsubishi Outlander.

12  Q    Did the Mitsubishi Outlander ever drive on to the golf

13  course?

14  A    No.

15  Q    It stayed at the 7-Eleven across the street from the golf

16  A    I believe so.

17  Q    At the – earlier before they left to go to the 7-Eleven

18  and then the actual scene of the plan, rip, three of – three

19  people went to a convenience store to get duct tape, you said?

20  A    Yes.

21  Q    And in fact, there is surveillance video showing that they

22  shoplifted that duct tape?

23  A    Yes.

24  Q    And none of those three individuals was Mr. Butler,

25  correct?

1  A   Correct.

2  Q   Okay.

3              The operation began back on July 24th, 2023; is

4  that correct?

5  A   Yes.

6  Q   When the Confidential Human Source contacted Mr. Maxwell?

7  A   Yes.

8  Q   So, that was somebody at the operation – at the direction

9  of your taskforce contacted Mr. Maxwell and stated that there

10  was going to be a 122 kilos at this location?

11  A   Correct.

12  Q   And there never were a 122 kilos, to your knowledge,

13  anywhere involved in this?

14  A   No.

15          MR. VINAS:  I'll pass the witness, Your Honor.

16          THE COURT:  Okay.  Anything further from the

17  Government?

18          MR. PARADISO:  Oh, yes.

19              Sorry, Your Honor.  I thought there was one

20  more.  I totally forgot.

21              Yes, Your Honor.

22                  [RE]DIRECT EXAMINATION

23  BY MR. PARADISO:

24  Q   Detective Bock, let me ask you a few questions.

25              When the individuals went to the hotel, the

1  Residence Inn, was there a video surveillance within the room?

2  A    There was.

3  Q    Okay.

4                And outside the room, do you know – did the

5  hotel have video surveillance also?

6  A    Yes.

7  Q    Okay.  And as part of the investigation, did the FBI

8  gather that intelligence – that out- -- that hotel

9  surveillance?

10  A    It did.

11  Q    Okay.

12                Additionally, to that surveillance, were there

13  HPD and other law enforcement officers around the location

14  observing it?

15  A    They were.

16  Q    And were those members of the HPD gang taskforce?

17  A    The Gang Division, yes.

18  Q    Okay.  And are those individuals familiar with individuals

19  who are part of or associates of the Early Boys Scoot-up Gang

20  (phonetic)?

21  A    Very familiar.

22  Q    Okay.

23                While they were there, did they observe

24  individuals who were in the four vehicles that were used in

25  the robbery?

1    A    They did.

2    Q    Okay.  At that time, were they able to identify them

3    either by their physical features or just maybe potentially

4    their knowledge of that individual?

5    A    Yes.

6    Q    Okay.  And while there, did they see them wearing clothing

7    that they had on that day?

8    A    They did.

9    Q    And based on that, did they then observe those individuals

10   get into the four vehicles?

11   A    They did.

12   Q    And when they got into those four vehicles, were the HPD

13   Gang Division individuals able to identify who go into what

14   vehicle?

15   A    They did.

16   Q    Okay.  Once those vehicles started taking off down the

17   road from the Residence Inn to the target location, were they

18   surveilled at that time?

19   A    They were.

20   Q    And was that continuous surveillance?

21   A    It was.

22   Q    And was that aerial surveillance?

23   A    It was.

24   Q    And so, those vehicles were watched the whole time?

25   A    Yes.

1  Q   And is – to your knowledge, did those vehicles, other than

2  what was talked about in the proffer, ever stopped and

3  individuals get out or get into those vehicles?

4         MR ADLER:  I'm sorry.  I don't mean to interrupt.

5              I just have a lot of objections, but the

6  leading has gone on for quite a while, Your Honor.  I would

7  rather it just be in question and answer form rather than

8  leading.

9         MR. PARADISO:  Okay.

10         THE COURT:  Sustained.

11         MR. PARADISO:  Yes, Your Honor.

12             Uh- --

13         THE COURT:  Just rephrase.

14         MR. PARADISO:  Yes, Your Honor.

15  BY MR. PARADISO:

16  Q   Are you aware – did those individuals ever stop, other

17  than what's in the proffer, to get in and out of those

18  vehicles?

19  A   I don't believe so.

20  Q   Okay.

21         THE COURT:  Do you know?  Yes or no?

22         THE WITNESS:  No.

23  BY MR. PARADISO:

24  Q   Okay.

25             But there was continuous aerial surveillance on

44

1   those vehicles?

2   A   Yes.

3   Q   All right.

4            And with Mr. Jenkins, there was discussion of

5   whether or not he was in the meeting?  Yes?

6   A   Yes.

7   Q   Okay.

8            THE COURT:  What do you mean – you mean the questions

9   were asked?

10           MR. PARADISO:  I'm sorry.

11           THE COURT:  Okay.

12           MR. PARADISO:  I'm sorry, Your Honor.

13  BY MR. PARADISO:

14  Q   The questions that were asked.

15           Well, based on your review, do you know were the

16  HPD Officers able to identify Mr. Jenkins outside in the

17  Residence Inn parking lot?

18           MR. VAZQUEZ:  Objection.  Leading, Judge.

19           THE COURT:  Overruled.

20           THE WITNESS:  In the Residence Inn parking lot?

21  BY MR. PARADISO:

22  Q   Yes.

23  A   Yes.  They saw him getting into the gray Dodge Charger.

24  Q   So, they were able to identify him?

25  A   Yes.

DIGITAL SCROLL TRANSCRIPTION                    281.382.9862

1   Q    Okay.

2               And then, for Mr. Butler, did you have a chance

3   to review the video surveillance that was within the hotel

4   room?

5   A   I did.

6   Q    Okay.

7               And at that time are you aware did he brandish a

8   firearm?

9   A   He did.

10  Q    Okay.

11              And do you recall the statements that he made in

12  a proffer; were those that he made?

13  A    I do.

14  Q   Okay.  There was the question regarding whether or not he

15  went to the store to get the duct tape.  Who is the one who

16  told the individuals to go get the duct tape?

17  A   Defendant Derrick Butler.

18  Q    Okay.

19              And while this was occurring, Mr. Butler's

20  vehicle was located where when the individuals went on to the

21  golf course?

22  A   I believe it was at the 7- -- well, I'm not – I'm not

23  sure.  At -- it was outside of the – in close vicinity, but I

24  don't know exactly where, what parking lot he was in.

25  Q   So, he was in a parking lot outside the vicinity?

1  A    In- -- inside the vicinity, like, within the vicinity,

2  yes.

3  Q   Okay.  And so, do you know - did he have a view of the

4  golf course and the individuals going in?

5  A   Yes.

6  Q   Okay.

7                   And when they were - when the individual was

8  going to open the gate, what was Mr. Butler doing with his

9  vehicle?

10 A   He was driving up and down, back and forth in front of the

11 location where the gate was.

12 Q   And waiting for it to open?

13 A   Yes.

14 Q   And once it opened, what did he do?

15 A   He - he stopped moving.

16 Q   Okay.

17                 No more - no more questions, Your Honor.

18             THE COURT:  Okay.

19                 Anything further from the Defendants?

20             MR. VAZQUEZ:  Briefly, Judge.

21                        RECROSS EXAMINATION

22 BY MR. VASQUEZ:

23 Q   You didn't see Mr. Jenkins there, correct?

24 A   I didn't.

25 Q   So, you're just relying on other Officers, correct?

1    A    That's correct.

2    Q    And you said that Butler was driving the first vehicle,

3    correct?

4    A    Yes.

5    Q    And then, Draper was driving the other vehicle that

6    Mr. Jenkins allegedly got into, correct?

7    A    Yes.

8    Q    So, at no point was Mr. Jenkins driving?

9    A    Correct.

10   Q    And you said this happened on the 26th or 27th of July,

11   correct?

12   A    Yes.

13   Q    And they were arrested August 24th?

14   A    Yes.

15   Q    Did you know where Mr. Butler – or Mr. Jenkins was?

16   A    At – yeah, we identified him as part of the round-up

17   efforts is where he was standing, so, yes.

18   Q    But you waited until you went to the grand jury to arrest

19   him, correct?

20   A    Until after.  After we had – we had an arrest warrant,

21   yes.

22           MR. VASQUEZ:  Nothing further, Judge.

23           THE COURT:  Okay.  Anything further from any of the

24   other Defendants?

25           MR. VINAS:  Briefly, Judge.

48

<pre>
 1                    RECROSS EXAMINATION
 2   BY MR. VINAS:
 3   Q   Detective Bock, you said that Mr. Butler was – he directed
 4   the individuals to go to the convenience store to get the duct
 5   tape?
 6   A   Yes.
 7   Q   But then later when they were leaving somebody tried to
 8   put duct tape on the license plate, and then another member
 9   told them, don't bother with that; don't do that.
10   A   Yes.
11   Q   And I'll ask the same questions that Mr. Vazquez just did.
12              Between July 27th and August 24th, did you know
13   where Mr. Butler was?
14   A   The entire time?  Are you asking the entire time, or –
15   Q   At times.
16   A   Or at some point?
17   Q   Yes.
18   A   At some point we – we did – we learned where – this is
19   what I meant the last – we didn't know his location the entire
20   time, but as part of the efforts to locate all the individuals
21   to arrest them simultaneously, we did discover the location.
22   Q   And that was here – the – the location you discovered
23   Mr. Butler at was here in Houston, Texas?
24   A   It was.
25   Q   Were you present at the time of his arrest?
</pre>

1    A    No.

2    Q    Do you have any details as to what happened at his arrest?

3    A    I got – I'm aware – I was in the – under the Operation

4    Center type thing, so I'm aware that a SWAT team went to the

5    location and effected his arrest.

6    Q    No details other than that that you're aware of?

7    A    No.

8              MR. VINAS:  Pass the witness, Your Honor.

9              THE COURT:  Okay.

10                  Thank you very much, Detective Bock.

11                  You may step down from the witness stand.

12                  Anything further from the Government?

13             MR. PARADISO:  Nothing further from the Government,

14   Your Honor.

15             THE COURT:  Any proffer, any witnesses on behalf of

16   the Defendants?

17             MR. ADLER:  Yes. Your Honor.

18             THE COURT:  Mr. Adler?

19             MR. ADLER:  On behalf of my client, I would – first

20   of all, his mother, cousin and girlfriend are here in the

21   audience.

22                  Would you stand just so the Government can see

23   ya'll?

24                  Thank you.

25                  You can be seated.

DIGITAL SCROLL TRANSCRIPTION                    281.382.9862

1          I would proffer the testimony of his cousin,

2    LaPortia Howard (phonetic).  She's 23 years old, a U. S.

3    citizen, no convictions.  She works parttime for a security

4    company and fulltime for a food service company.  And she does

5    not own her own residence, Your Honor.  She is renting.

6          But she would testify that she's known my client

7    their entire lives.  He has not been violent, that he's not a

8    risk of flight, and she is willing to sign on his bond as a

9    surety to guarantee the Court that he would appear.

10          Also here is Elisa Ruiz, his girlfriend – my

11    client's girlfriend of two years.  She is 23 years old as

12    well, a U. S. citizen, no convictions.  She has worked for two

13    years at a daycare.

14          She and my client live in Section 8, Government

15    sponsored housing, but she will also testify that she has not

16    seen my client be violent, that she believes he's not a risk

17    of flight and is willing to sign on any bond should the Court

18    see fit to grant bond in this hearing.

19          Those are the only proffers I have for

20    Mr. Mitchell, Your Honor.

21          THE COURT:  Okay.

22          Thank you very much.

23          Mr. Vazquez?

24          MR. VAZQUEZ:  Yes, Judge.

25          I, too, also have proffers.

1          Present today in the courtroom are Mr. Jenkins'

2    grandmother, Mary Jenkins.  She retired from here, actually.

3    She was on the custodian staff here in the building for many

4    years, recently retired.

5          She does have her own residence, which is about

6    ten minutes from where Mr. Jenkins resides.

7          We also have his father, who is also present,

8    Jeremy Jenkins – I'm sorry – Jerry Jenkins.

9          Mr. Jenkins is Jeremy's supervisor at work.

10   They work for ATT Plastics, and Mr. Jenkins would testify that

11   as the supervisor he would be having Jeremy on the same shift

12   as him, so he can monitor him at work.

13         As well, Mr. Jenkins worked – or Jeremy worked

14   there for, I believe, for about a year after high school and

15   continues to work there, and obviously, would be willing – the

16   father said he – you know – could continue to work there.  So,

17   he would have stable employment.

18         We also have his sister present, Janisha Jenkins

19   (phonetic).  She is a student.  She does – she works full- --

20   or parttime at Hobby Airport.  She works the 4:00 a.m. to noon

21   shift at Hobby Airport.  She also goes to school for a Medical

22   Assistant.

23         And then, finally, Judge, we have his mother

24   present.  His mother is – I'm sorry – I have the name here –

25   LaTarsha Misuria (phonetic).  She does reside in Houston.

1  Probation has identified her as the third party custodian, a

2  suitable third party custodian.

3            I have spoken to her.  She is willing to sign

4  for that.  She does work for HISD.  She works during the lunch

5  hours, especially.  That's – her job is – is the food

6  services.

7            I have all of their contact information, all of

8  their phone numbers.  Everybody's willing to make sure that

9  Mr. Jenkins comes to and from court as required.

10            They will all testify that they have not seen

11  him be violent in any ways.  And would also testify that

12  Mr. Jenkins does not have any history and does not pose a

13  danger to himself or others, as well as not a flight risk.  He

14  is a lifetime – they've all testified he is a lifetime

15  resident of Houston, Judge.

16        THE COURT:  Okay.

17            Thank you very much.

18            Mr. Vazquez, with respect to Mr. Butler – Mr.

19  Vinas?

20        MR. VINAS:  Yes, Your Honor.

21            For Mr. Butler, the entire back row of the

22  courtroom is here for Mr. Butler.

23            His father, Derrick Butler; his grandmother,

24  Shirley West; his girlfriend, Attorney Hart (phonetic); his

25  mother, Kelly West would all act as – as a surety and/or a

1 | third party custodian.

2 | They're all of age, United States citizens.  I

3 | do not believe anyone has any convictions that I've been able

4 | to locate and would all - I specifically asked Ms. Hart the

5 | difficult questions, as far as third party custodian, because

6 | he lived there, would you watch over him and, most

7 | importantly, if Mr. Butler were to violate any bond conditions

8 | would you then be willing to notify the Court that he has done

9 | so, and she said, absolutely, she would do that.

10 | He's got no mental health diagnosis.  He's - his

11 | ties to the - his family ties to the community, he's got two

12 | young children, a three-year old son, Derrick and a one-year

13 | old son, Decari (phonetic), both of whom live with

14 | Mr. Butler, and when Ms. Hart is working, he takes care of

15 | those boys.

16 | In fact, today is his older son, Derrick's first

17 | day of school, and he missed that, obviously, because he's

18 | here.  But he takes an active role in - in raising his two

19 | sons and supporting them.

20 | He also has - the mother of his - of his older

21 | son - Ms. Hart, is the mother of his younger son.  The mother

22 | of his older son, Ms. Ragston (phonetic), also lives here in

23 | Houston.  Mr. Butler's sister, Ariel Moore (phonetic); his

24 | other sister, Derricka Butler (phonetic) and his brother

25 | Travian Butler (phonetic), I believe they are here.

54

1          He's fulltime employed with the Robert Field

2   Fabrications as a welder and a welder helper.  At times when

3   that employment – because they work on a contract basis –

4   slows down he does other things.  Most notably, he's a horse

5   trainer for people in his area, got a word-of-mouth-type

6   business where he gets customers, people who need to have

7   their horses trained or they need to be trained on how to ride

8   and take care of their horses.  So, he's – financially

9   supports his family that way.

10          He has lived in Houston his entire life.  The

11  Pretrial Report indicates that he has a passport.  He would be

12  willing to give that up.  He's not traveled in two years with

13  that passport.

14          His history of drug use is relatively minor.

15  And –

16          That's all for the proffer, and then I will save

17  the rest for argument, Your Honor.

18          THE COURT:  Okay.  Great.

19          Thank you very much

20          Anything further from the Defendants or the

21  Government before we get to argument?

22          MR. PARADISO:  Not from the Government, Your Honor.

23          THE COURT:  Okay.

24          Let's hear from the Defense.

25          MR. PARADISO:  Okay, Your Honor.

1          THE COURT:  Okay.  Let's – let's go to argument.

2               Presumption case, right?

3          MR. PARADISO:  Yes, Your Honor.

4          THE COURT:  Are you seeking detention on risk of

5     flight and danger to the community?

6          MR. PARADISO:  Primarily, for dan- -- danger to –

7     excuse me, Your Honor – danger to the community.  And

8     Mr. Butler would actually be a risk of flight.  I don't

9     believe we're doing Mr. Maxwell at this time, right, Your

10    Honor?

11         THE COURT:  Correct.

12         MR. PARADISO:  And same thing with Mr. Mitchell,

13    given that he has another Indictment here that you will be

14    hearing tomorrow?

15         THE COURT:  I'm not – so, who are seeking risk of

16    flight on?

17         MR. PARADISO:  Oh, I'm sorry – Mr. Butler and

18    Mr. Mitchell, Your Honor.

19         THE COURT:  Okay.

20               What evidence is there a risk of flight?

21         MR. PARADISO:  Sure.

22         THE COURT:  Are is it just – hey, they – well –

23         MR. PARADISO:  Yes, Your Honor.

24         THE COURT:  Let me ask that question.

25         MR. PARADISO:  So, for Mr. – excuse me – so, for

DIGITAL SCROLL TRANSCRIPTION                    281.382.9862

1  Mr. Butler, he has numerous violations of his Pretrial Release

2  when he was on state time, has an extensive criminal history

3  and now, he's facing a significant amount of jail time.

4             He has failure to appear revocations, multiple

5  bond violations, so he would be a flight risk, potentially

6  just on those.

7             THE COURT:  Okay.

8             MR. PARADISO:  Obviously, he does have a past –

9             THE COURT:  Why Mr. Mitchell?

10            MR. PARADISO:  Sure.

11            Mr. Mitchell, Your Honor, is because he's facing

12  two Indictments here in this court on similar offenses.  So,

13  he's facing an extensive criminal time, which would give him a

14  reason to flee.

15            I believe Your Honor is hearing that tomorrow

16  afternoon – tomorrow morning or tomorrow afternoon.

17            THE COURT:  Okay.  Let's – and Jenkins you're not

18  seeking a detention based on risk of flight?

19            MR. PARADISO:  No, Your Honor.

20            THE COURT:  Okay.

21            Let's start on danger to the community.  Let's

22  start with Jenkins.

23            But why is he a danger to the community?

24            MR. PARADISO:  Yes, Your Honor.

25            So, Mr. Jenkins, though he doesn't have a

DIGITAL SCROLL TRANSCRIPTION                    281.382.9862

1   criminal history, he went to a – rob a Mexican drug cartel of

2   a 122 kilos.  He was there; he was in a vehicle with

3   Mr. Butler.  He switched to go into the vehicle that was then

4   the secondary entry into the target location and was making

5   his way there, and at some point the individuals who were in

6   that location must have radioed them or somehow got in touch

7   with them to head back out of that location.

8            So, the plan was to go in, and as Mr. Butler

9   said in his – into the recording in the hotel, we're going to

10  kill them; we're going to smoke them, if we got to.  So, they

11  were going into do that.

12           So, based on that, he is a danger to the

13  community.  He is willing to associate with others who are

14  going to then do these drug rips and murder individuals.  And

15  he made a conscious effort and choice to do that and,

16  therefore, he is a danger to the community, if released.

17           THE COURT:  Okay.

18           Mr. Vazquez, I'll give you a chance to respond.

19           MR. VAZQUEZ:  Yes, Judge.

20           I think the evidence speaks for itself.

21  Mr. Jenkins is not a driver of any of the vehicles.  He's not

22  involved in any way of the planning of this supposed rip.

23           He allegedly is seen by HPD Officers, who we

24  have not heard – heard from, getting into one, driving to

25  the – apparently driving to the location, getting out of that

1   vehicle, getting in another vehicle.  I believe Draper is

2   driving that - that second vehicle.  They drive onto the

3   property, don't get anywhere near the target house; leave -

4   are stopped by HPD.  They're stopped by HPD, as Mr. Vinas

5   rightfully pointed out.  HPD at that point had all the

6   information that the surveillance teams had.  They could have

7   very easily detained both Draper and Mr. Jenkins at the time

8   and if they felt that he was a danger to the community or to

9   himself, Your Honor.

10          THE COURT:  Let's say - I'm just curious.  What's the

11   Government's response to that?

12          MR. PARADISO:  Yes, Your Honor.

13              It was an ongoing investigation, and they were

14   still doing things.  That's why at that point in time they did

15   not effectuate the stop.

16          THE COURT:  Okay.

17          MR. VAZQUEZ:  So, he's released; no weapons are found

18   on him.  No search is conducted; no weapons.

19              He's out presumably working for about a month

20   until the Government decides to - to seek the Indictment

21   and - and go from there, so obviously, not a danger to

22   himself.  If he - he was, he would have an extensive criminal

23   history.  He has no criminal history.

24              He's a young man.  He was supposed to start TSU

25   this fall.  Unfortunately, due to this, he's - he's not able

1   to – to start.  He's graduated high school.  He's got plenty

2   of family.  I'm sure the Court is aware he's not a flight

3   risk.

4                He's got plenty of family.  There's no weapons

5   in – in the homes.  I have instructed the family that if there

6   are any weapons that they need to remove any weapons and that

7   the family is willing to comply with any conditions that the

8   Court may impose.

9                So, as far as danger to the community, Judge,

10  that he has no – he has no history, not alleged to have been

11  one of the ones involved in the planning, knowledge or been

12  one of the ones that actually entered into the – to the

13  location.  All his involvement is, is getting in and being a

14  passenger in a vehicle that's driven by others.

15               So, at this point, Judge, I would argue that

16  that's insufficient to meet the – the high standard of danger

17  to – to himself or to others, and we would be asking for

18  release, Judge.

19          THE COURT:  Okay.

20               Thank you very much.

21               Let's talk about Mr. Butler.  And I guess –

22  Mr. Vinas, help me out.

23               I have a feeling I – I know what the Government

24  is going to say, which is, hey, he brandished a firearm; he

25  had a willingness to use a weapon as part of a robbery.  He

1  was the ring leader, and then, they're going to point to his

2  criminal history and say, hey, it's not just an extensive

3  history, but I think I counted six times where he violated the

4  terms of his release.

5              How do you overcome that?

6         MR. VINAS:  I want to make sure I get of those.

7              You said, brandished a firearm; third was –

8         THE COURT:  Well, I – I – you know, I don't want to –

9  I don't want to take – I'll see what else the Government says,

10 but I – I have a funny feeling that's at least going to be

11 the – the thrust of it.  But –

12             I guess my question really is, how do you get

13 over the fact if I – if I want to put conditions, whether it's

14 risk of flight or danger to the community, how do I have any

15 confidence that he is going to comply with them, because every

16 single time he's been put on release he's just flaunted it;

17 he's violated the condition.

18        MR. VINAS:  I'll take them in order.

19        THE COURT:  Okay.

20        MR. VINAS:  I agree I don't know what the Government

21 is going to say, but I'll directly focus on that issue, Judge.

22        THE COURT:  Well, I want to focus on that issue.

23 That's the issue I want to focus on.

24        MR. VINAS:  Sure.

25             Okay.

1          Well, as far as brandishing the firearm and

2    willingness to use it, that happened at a different day and at

3    least at a different location.  I can't remember if that –

4    from the testimony if that was July 26th or July 27th, because

5    they talked about two different – two different meetings.  But

6    willingness to use a firearm, he never went to the actual

7    crime scene.  So, whether he said these things to the – to the

8    Confidential Informant or not – at some point I'm hoping we'll

9    get a video that will answer that question – that at best for

10   the Government is – is kind of being braggadocious.  He didn't

11   even go to the location where the Government set up this fake

12   robbery to occur.  He waited across the street.  Whether or

13   not he could see –

14          Detective Bock doesn't know – doesn't know

15   whether he's got eyes on that, but even if he does, he never

16   moved.  They went into the location, at least a couple of

17   vehicles.  Four guys went in; it wasn't Mr. Butler, and then

18   Mr. Jenkins and Mr. Draper, according to the Government's

19   evidence, were in another vehicle on the location.  Mr. Butler

20   never went there.

21          So, as far as brandishing the firearm and

22   willingness to use the firearm, I think – that just appears

23   that he was just maybe bragging.

24          I would disagree that he has extensive criminal

25   history.  In fact, if you go through his history and we look

1  at the United States Sentencing Guidelines, he's still –

2  assuming he's – the Government can prove their case and he's

3  convicted, he's still a Criminal History Category 1.

4            So, you – because most of these cases were

5  dismissed.  And the – when you go through and look – and as

6  you correctly pointed out, Your Honor, when he's had bail

7  revoked or failures to appear, if you look at those – if

8  you're looking at the first one, October 19th, 2020, bond

9  revoked; October 20th, 2020, bond reinstated, one day later.

10            Back in the next case, October 19th, 2020, bond

11 revoked.  Three days later bond reinstated.  The State of

12 Texas filed a Motion to Revoke his bond, but it does not

13 appear that that was – on November 24th, 2020, it doesn't

14 appear that that was ever granted, and then, that case was

15 dismissed.

16            In the next case on October 19th, 2020, failure

17 to appear, bond revoked.  October 20th, 2020, bond reinstated.

18 These are not – and that's the same – just in interest of

19 time, I won't go through all of them, but that's the same

20 everywhere.  Is it within a day or a week or two when his –

21 anytime these were revoked, they were reinstated.  And, one, I

22 offer that to show the timeline.

23            THE COURT:  Wait a minute.  That's – that's not –

24 that's not true.  But the – the next one – I agree with you so

25 far, but I- -- I'm looking at January 18th, 2022, Motion to

1   Adjudicate Guilt filed and bond revoked due to new law

2   violation – failure to submit drug test, failure to pay fees

3   and court costs, failure to complete education evaluation and

4   program.

5           Then, on 4/10/22, bond revoke violation –

6           MR. VINAS:  So, going to that –

7           THE COURT:  -- for all those items.

8           MR. VINAS:  Going to that top one from January 18th,

9   2022, the next action the court took was they dismissed that

10  Motion to Adjudicate.

11          And I'll just tell you from my practice in

12  Harris County, these two – these three gentlemen at the table

13  with me and even AUSA Cooper can probably tell you that

14  doesn't happen without somebody showing back up in court.

15          So, the record is a little bit deplete there,

16  but there certainly was court action between January 18th,

17  2022 and April 21st, 2022, on that case.

18          The April 10th, 2022, which is the next one, you

19  talked about – I believe we got to go – it's not highlighted,

20  but on May 5th was when that bond was reinstated.  So, that's

21  the longest one.  That's only – that's approximately three

22  weeks until the bond was reinstated.  That's not even when we

23  know whether or not he showed up to court before that or not.

24  That's when we know the Court decided to reinstate his bond.

25          So, every – every one of these, either the case

DIGITAL SCROLL TRANSCRIPTION                     281.382.9862

1   ultimately was dismissed, or his bond was quickly reinstated.

2   And the court - these - these judges - I know them all - would

3   not have reinstated his bond unless he was there or unless his

4   lawyer, whoever that was, gave sufficient reason to the judge

5   to say, hey, he was in the hospital or he was - something to

6   that effect, where they would reinstate it.

7            So, from looking at this record, I can tell he

8   showed back up relatively quickly and that these judges

9   reinstated those bonds, goes to show it was on some type of

10  technicality as opposed to him fleeing the jurisdiction.

11           And so, while, yes, it looks bad on paper when

12  you look at it from that perspective Mr. Butler anytime his

13  bond was revoked it was almost immediately reinstated, and he

14  followed those conditions until - in all but two of the

15  cases - the cases were dismissed, and in two of them he got

16  probation.

17           And I know that - I see the pensive look on your

18  face, Judge, that when I say he followed the conditions, when

19  you read that, well, there's a new law violation, those cases,

20  if you follow through the chart, most of those were ultimately

21  dismissed.

22           So, those are the three questions you had

23  asked -

24       THE COURT:  No, no, no.  I appre- -- I appreciate

25  that.

1          MR. VINAS:  Thank you, Judge.

2          THE COURT:  And I'll give you a chance to add

3   anything –

4          MR. VINAS:  Sure.

5          THE COURT:  -- else, but –

6               Let me hear from the Government on Mr. Butler.

7          MR. PARADISO:  Yes, Your Honor.

8               One of the things the Government would say is,

9   yes, that's great that – that they gave him bond again, but we

10  don't know why the judge did that at those times.

11              Additionally, what you just kept hearing is

12  whenever the court ordered Mr. Butler to do something,

13  Mr. Butler decided he was going to do what he wanted to do and

14  disobey the court and the court had to bring him back in and

15  try to reinstate those each time.  And he has extensive

16  history showing that he is not going to follow what the court

17  says, and he's going to do what he chooses to do.

18              Additionally, it's Mr. Butler who was there, and

19  he was the one who was telling – giving orders to people of

20  what to do.  He was there on July 27th at the meeting in the

21  hotel right before everybody starts driving down the road.

22  And it was Mr. Butler's car who was in the lead going to the

23  location.  And it was Mr. Butler who parked across the street

24  so that he could see within, and it was Mr. Butler who then

25  had Mr. Jenkins get in the other car so that Mr. Jenkins could

1  then go on to the property.

2            Mr. Butler brandished the firearm and talked

3  about going in smoking, these N words and how they were going

4  to kill people when they got there.  And it's my understanding

5  based on his criminal history that Mr. Butler would have been

6  a felon at that time who was in possession of a firearm, which

7  he bragged about of what type it was and how he's used it on a

8  million missions.

9            So, Mr. Butler has shown that he is a danger to

10  the community.  He is currently on probation while he

11  committed this offense also.  So, he has not shown anything to

12  rebut the presumption that he's a danger to the community, and

13  he should be detained.

14        THE COURT:  Okay.

15            Anything further?

16        MR. VINAS:  I believe that Probation is a deferred

17  adjudication, so I don't think the Government can file a 922

18  case on him, so he would not be a felon in possession of a

19  firearm.

20            And, again, we don't know – it's speculation

21  unless the Government had a wiretap warrant for the inside of

22  the vehicle that Mr. Butler was driving, and there's no

23  evidence that they did – there's nothing to indicate that

24  Mr. Butler ordered Mr. Jenkins to get out of the vehicle and

25  go onto the property.

1          And I want to – I want to bring back up – I know

2    you've heard it already – the fact that whether there was an

3    ongoing investigation or not – if any of these men were a

4    danger to the community, they were under law enforcement

5    surveillance from multiple angles that night.  And the case

6    law would, as we know, is just a little bit out of context,

7    say on a traffic stop, if law enforce- -- you don't have the –

8    the stopping Officer doesn't have to have all of the knowledge

9    himself.  It's imputed from the other members of the team that

10   if he makes that – that traffic stop, then the other members

11   can radio into him either down from the helicopter hovering

12   right above or from other cars, go ahead and arrest them.

13   That was a strategic call that law enforcement made.  And they

14   set these guys loose.

15          And as Detective Bock testified, they weren't

16   under constant surveillance with the 30 days that they were

17   allowed to – to be in our community.  They – he didn't even

18   know where they were until after they knew they were getting

19   an Indictment and they went to find where these guys were.

20          So, if they were a danger to the community,

21   shame on them for letting them wander around for 30 days.

22   That seems just a little bit multifarious to make both of

23   those arguments.

24          Furthermore, this is not a case where law

25   enforcement just found out about some dope rip and sent in a

1    Confidential Informant and stopped it.  This was a case where

2    law enforcement dreamed this up, contacted Mr. Maxwell, and

3    that's how this whole thing started.  This was all conceived

4    and started by the Government, not by these guys.

5                So, I give that to the Court to - to respond to

6    what the Government has said.  He's not a flight risk.  He's

7    been here his entire life.  His whole family is here.  He's

8    not going anywhere.  And he's not a danger to the community

9    for the reasons that we've put forth.

10                THE COURT:  Okay.

11                Thank you very much.

12                With respect to Mr. Mitchell, from the

13   Government.

14          MR. PARADISO:  Yes, Your Honor.

15                As the Government has noted for the Court,

16   Mr. Mitchell has - is facing another Indictment in this Court

17   for a similar offense.  I believe you're hearing that

18   tomorrow, Your Honor.  Therefore, based on that as we said

19   earlier, he would be a flight risk.

20                Additionally -

21          THE COURT:  So, anytime someone is charged with two

22   crimes they are an automatic flight risk?

23          MR. PARADISO:  No, Your Honor.  But these are two

24   very serious offenses with an extensive amount of jail time,

25   which would make him a flight risk, in that name.

DIGITAL SCROLL TRANSCRIPTION                          281.382.9862

1          THE COURT:  Okay.

2          MR. PARADISO:  Additionally, it's my understanding,

3    from looking at the –

4          THE COURT:  Well, let me ask you –

5              Well, go ahead.  I'm sorry.

6          MR. PARADISO:  No, no.  Go ahead, Your Honor.

7          THE COURT:  No, go ahead.

8          MR. PARADISO:  Okay.

9              From the Pretrial Services Report, I don't

10   believe Mr. Mitchell has employment, or at least he may have

11   started employment about three days before he was arrested.

12   So, other than that, he had no other employment or ties to the

13   community in that way.

14              Excuse me.

15              He has used at least four aliases when he has

16   tried to – or had contact with law enforcement or individuals.

17   Additionally, he's – he's evaded arrest, and he has multiple

18   violent crimes that, unfortunately, the disposition at least

19   in the Pretrial Services Report is unknown to include

20   burglary, theft, possessing of a firearm and aggravated

21   robbery.

22          MR. ADLER:  Sorry.  What are you reading from?

23          THE COURT:  Just talk – I don't –

24          MR. PARADISO:  I'm sorry.  I read the wrong guy.  I

25   apologize.

1              I apologize, Your Honor.

2          THE COURT:  Okay.

3          MR. PARADISO:  I'm sorry about that.

4              Forgive me.

5          THE COURT:  I was looking – I was trying to figure

6  out what I was –

7          MR. PARADISO:  No, I apologize.  The names –

8          THE COURT:  Okay.

9              Let's talk about Mr. Mitchell.

10         MR. PARADISO:  Yeah.  I apologize.  I need to put the

11  glasses on.

12             So – yeah.  So, originally he did start work on

13  August 24th of 2023.  In looking at his Pretrial Services

14  Report, he has violated his conditions of release before.  So,

15  Mr. Mitchell here would be a danger to the community.

16         THE COURT:  But what – what do I know from this?

17             Well, I mean – let's just walk through his

18  criminal history.

19             He's got some criminal trespass, misdemeanors,

20  some sort of – well, looks like four of them, a contempt of

21  court – whatever that is – disposition unknown.  Then, there's

22  a felony possession charge.  And it just says he got revoked

23  and spent two years in prison, but I don't know any – no one

24  has given me any facts on that, right?

25         MR. PARADISO:  No, Your Honor, not –

1              THE COURT:  Okay.

2              MR. PARADISO:  I don't have any.

3              THE COURT:  Okay.

4                   And then, an unlawful possession of firearms.

5                   Okay.  So – well, what did he do?

6              MR. PARADISO:  So, Mr. Mitchell is one of the

7    individuals who actually broke into the building with weapons

8    drawn – automatic weapons drawn to rob the – the drugs.  He

9    was one of the four who went in the red Toyota Camry onto the

10   location, drove on to the location, made their way to the

11   building and then entered the building with weapons drawn to

12   try and rob the drug.  Based on the video, it is long rifles

13   and then handguns with extended magazines.

14             THE COURT:  Okay.

15                  Anything else?

16             MR. PARADISO:  No, Your Honor.

17             THE COURT:  Mr. Adler?

18             MR. ADLER:  Judge, I'm not sure I even need to

19   address the claim of what the Government says Mr. Mitchell did

20   at the scene, because I think the evidence is far from clear

21   that he was even there.  The Agent went back and forth several

22   times on whether or not he could state Mr. Mitchell was in the

23   hotel room or the vicinity.  Ultimately, when the Court asked

24   him, he said, no.  How they can then claim he was at the scene

25   of the golf course when people ware wearing masks is beyond me

1    at this point.  I frankly think had this case been before you

2    for a probable cause hearing the Government would have quite

3    an uphill battle.

4              Nonetheless we have Indictments, so I am not

5    arguing probable cause.  The question is, can the Court set

6    conditions of release that would reasonably assure – not a

7    guarantee but reasonably assure that Mr. Mitchell would not

8    flee and that he's not a danger to the community.

9              As far as fleeing, he's lived in Houston his

10   whole life.  His family is here.  He doesn't have a passport.

11   I'm not even sure, other than the trip to Louisiana, he's been

12   outside of this area very often.  He's certainly has never

13   left the U. S.

14             So, I don't think the risk of flight argument

15   carries very well.  I agree with the Court that – when the

16   Court raised the question about, well, two charges means

17   you're a flight risk, I think you can turn it around the other

18   way, which would be, well, if you only have charge against

19   you, then you're never a flight risk.

20             I don't know what the evidence is going to be

21   tomorrow.  That's for tomorrow.  The evidence here before you

22   today, the weight of the evidence today is extremely weak.  He

23   has, as you said, some misdemeanor convictions.  Frankly, I'm

24   shocked that the – anybody got time in jail for a criminal

25   trespass in Harris County, but it obviously happened to him a

1    number of times.

2              More importantly, he does have a conviction for

3    possession of a controlled substance.  He was – he was given

4    four years deferred adjudication for that, and he was revoked.

5    And I will tell the Judge is because he failed a – a drug test

6    for marijuana.  That was 10 months after he was put on the

7    deferred adjudication, and he spent time in prison as a result

8    of his sporadic – a drug problem – a marijuana drug problem.

9              I understand that the felony possession charge

10   is concerning to the Court, and I would point out that that

11   happened almost three years ago now and that I don't think –

12   it's not a violent offense.  He didn't do anything with the

13   gun.  He was just in possession of it.  And I think there's

14   case law that supports the idea that, you know, possession of

15   a firearm alone does not per se indicate danger to the

16   community.

17             So again, the question is not can the Court

18   guarantee these issues, but can the Court reasonably assure

19   them.  And I think the Court can send some very –

20             THE COURT:  So, what conditions should I impose?

21             MR. ADLER:  I think he should be restricted to his

22   home with an ankle monitor.  If he's able to apply for some

23   job outside the home, we can certainly approach the Court or

24   Pretrial to see if he can get some release hours when he can

25   go to work.  But keep him in the house the whole time, Judge,

74

1   that the – you know, the technology today – I don't have to

2   tell the Court, but – is such that if he steps 10 feet outside

3   that house Pretrial is going to know about it, and then we'll

4   get revoked.

5            You know, the days of just guessing what is he

6   doing when he's supposed to be at home are long gone.  He just

7   can't leave the house.  I don't have an problem with that.  I

8   don't think he has any problem with that.

9            I do think – I would ask the Court, if the Court

10  is inclined to go that way, that you at least make an

11  exception for meetings with his lawyer and religious services

12  and, of course, medical appointments, if he needs them.  But

13  he's in good health, so I don't think that would be a problem.

14            That's all.

15          THE COURT:  Okay.

16            Anything further from the Government?

17          MR. PARADISO:  Yes, Your Honor.

18            The Government would just note that in this

19  instance Mr. Mitchell had a weapon, and he went in and the HPD

20  Officers were able to identify who he was based on his

21  clothing that they – and where – that he wore when he went

22  into the building, and they were able to identify him wearing

23  those same clothing at the Residence Inn when they could see

24  his face.  So, this will be the second time while he's been

25  out he has a weapon and, obviously, according to Defense

DIGITAL SCROLL TRANSCRIPTION                          281.382.9862

1   counsel, he can't possess it.

2            So, the Government does not believe there's any

3   conditions that would allow him to not be a danger to the

4   community.

5        THE COURT:  What's your response to that, Mr. Adler?

6        MR. ADLER:  My response is, I don't know what the

7   heck they're talking about.  The Agent did not testify that he

8   was seen in the hotel room.  He was back and forth on whether

9   or not he was seen in the vicinity of the hotel room, and then

10  they magically say, well, one of these guys with a mask at the

11  golf course is my client.

12           So, I think there are massive gaps between what

13  the Government is telling the Court the testimony was and what

14  the actual testimony of the Detective was.  I understand what

15  they would like it to be, but that's not what we're here for.

16       THE COURT:  Okay.  Let's do this.

17           Let's – give me five minutes.  I want to sort of

18  collect my thoughts.  And I apologize – I know we've gone

19  late, and we've got a criminal docket coming up, but I

20  obviously understand its importance to both the Government and

21  the Defendant, so.

22           You can stay seated.  I'm going to sit up here

23  for a minute.  I just want to look over some stuff, so we're

24  off the record for a couple of minutes.

25       (Pause in the proceedings at 2:28:13 p.m.)

1          (Proceedings resumed at 2:36:34 p.m.)

2               THE COURT:  Okay.  Please be seated.

3                    Thank you all very much for the argument, for

4    the time.  Once again I apologize for the delay, but I wanted

5    to make sure I give everyone a full and fair opportunity to

6    make their presentations, because obviously I understand the

7    significance, as I say, both to each individual Defendants,

8    all the families that are here, and, of course, the

9    Government.

10                   As I always like to say upfront, you know, we're

11   here for one question today and one question only, and that

12   is, should these gentlemen – Mr. Butler, Mr. Mitchell,

13   Mr. Jenkins be held in custody pending the trial of this case.

14   I emphasize this every time I have a Detention Hearing to all

15   of the Defendants, gentlemen, you're innocent until proven

16   guilty.  Nothing that goes on today affects that presumption

17   of innocence.  The only question is, should you be held

18   pending the trial of this case.  And I do not make this

19   decision likely.

20                   I understand that, you know, the Bail Reform

21   Act, the federal law that governs this says that detention is

22   the exception rather than the rule; it should not be common

23   place in our society based on the law that simply because

24   you're charged with a crime you're held in custody.

25                   At the same time, what the Bail Reform Act says

1   is, that if you're a risk of flight or a danger to the

2   community and there are no conditions that I can impose to

3   alleviate those threats that I'm required to detain you

4   pending the trial of this case, and I understand that.

5                Let me say in this case, first of all, the

6   Government, at least with respect to Mr. Butler and

7   Mr. Mitchell, is seeking detention on risk of flight and

8   danger to the community.  And then, obviously, with respect to

9   Mr. Jenkins just based on a danger to the community.

10               I think the lawyers all know the standards.  On

11  the risk of flight, the question is, can the Government show

12  by a preponderance of the evidence, just basically, more

13  likely than not, that Mr. Mitchell and Mr. Butler are risks of

14  flight. And there's no conditions I could impose to alleviate

15  that threat.

16               On the danger to the community, the burden is

17  higher on the Government's end.  The Government has to show by

18  clear and convincing there's no conditions or combination of

19  conditions that I could impose to assure the safety of the –

20  of the community.

21               With respect to Mr. Jenkins, let me just say up

22  front, I do not think the Government has met its burden on

23  the – on the danger issue.  I think the evidence is clear

24  that  – you know, obviously, Mr. Jenkins is charged with a

25  serious crime, no doubt about it.  But at the same time, there

1    was no weapon; he wasn't the driver, was not involved in the

2    planning.

3              To me, he has a stable employment.  Obviously,

4    he has family members here, and he has no criminal history.

5    There's nothing that I look in the past.  You're young, and –

6    I'll say this – you know, obviously, this happened in July.

7    We're now here involved – it's the beginning of September –

8    there's nothing that I have before me that, any case –

9    anything happened in that – that month in the interim which

10   gives me some confidence.

11             But at the end of the day, I think there are

12   conditions that I could impose to alleviate the risk to the

13   community.  So, I'm going to allow you to be released here

14   today, Mr. Jenkins, but I'm going to impose some conditions on

15   you that you need to follow to make sure that you – you

16   follow.  And if you -= I'm going to be very clear – if you

17   violate any of these conditions – and I'm going to have the

18   family members here, too – if you violate any of these

19   conditions, I am confident the Government will be back in here

20   asking that you be held in custody, and you should fully

21   expect that to happen at that time, if that happens.

22             Your lawyer doesn't want it.  You don't want it.

23   I know your family doesn't want it.  The Government doesn't

24   want it.  I don't want it.  No one here today wants it.  Okay?

25   So, you got a great lawyer.  You're going to have Pretrial

1    Services.  If you have any questions about the conditions that

2    I'm going to impose, ask your lawyer, ask Pretrial Services

3    before.  In other words, don't come later and say, oh, I

4    didn't realize; I did this; I didn't realize I could have or

5    couldn't do that.

6              I'm going to go over these conditions with you.

7    I know you have your family members here to listen very

8    closely to those conditions, to make sure you comply with the

9    conditions.  I – and you're going to get a written copy of

10   this as well.

11             Okay.  First of all, the conditions,

12   Mr. Jenkins, you need to follow – can't violate any federal,

13   state, local law; can't try to intimidate any witnesses or

14   obstruct an investigation.

15             You have to make all court appearances.  And if

16   you are convicted, surrender at the appropriate time.  I'm

17   going to have an unsecured bond, which means that in the event

18   you violate any of these conditions, you're going to be

19   required to pay $50,000.

20             I'm going to have a third party custodian, which

21   is your mom, LaTarsha Misuria (phonetic), who I know is here

22   in the courtroom – and let me make sure I have on my street –

23   that is – is the address 14207 Pligh Street?

24             Okay.  Let me write that down.

25        MR. VAZQUEZ:  Yes, Judge; P-L-I-G-H.

1          (Pause in the proceedings.)

2              THE COURT:  And Ms. Misuria (phonetic), let me say –

3    I know we talked about you being – you are going to be the

4    third party custodian, which means you're going to be

5    responsible for making sure that your son attends court

6    appearances and he doesn't violate these conditions.

7                  And you understand that if he does violate any

8    of these conditions that I'm going to go over, although you're

9    his mother, you have an obligation to inform the Court that he

10   has violated these conditions.

11             MS. MISURIA:  Yes, Your Honor.

12             THE COURT:  Okay.

13                 And, obviously, I know you don't want him to

14   violate the conditions.  You'll do everything to make sure

15   that he complies with these conditions.

16                 So, here's the conditions.

17                 First, I'm going to have you – in addition, I'm

18   going to have you report to Pretrial Services on a regular

19   basis.  You're to maintain or actively seek fulltime

20   verifiable employment.  I know we heard that you have a job

21   with – with your dad.  Your –

22                 If you have a passport, you have to surrender

23   that passport.  You can obtain no further passport.  Your

24   travel is going to be restricted to Harris County and the

25   bordering counties.  That means that connect – basically,

1    touch Harris County.  And I'll be very honest with you.  I

2    couldn't name all those counties.  Okay?

3           So, be careful.  Make sure you talk to your l

4    lawyer or make sure you know where you can and can't go, but

5    it's Harris County and the bordering counties.

6           All con- -- and avoid all contact with any

7    co-Defendants, any witnesses, any potential victim.  No

8    excessive use of alcohol.  Refrain from possessing a firearm,

9    destructive device or other dangerous weapon.

10           Obviously, no use of narcotic drug or possess a

11    narcotic drug, unless it's prescribed by a – by a doctor, and

12    you need to – if you have – if you're on a – you need to

13    report any contact you have with law enforcement to Pretrial

14    Services.

15           As I always say, if you're in a car and you get

16    pulled over by the police, call Pretrial Services.  Don't let

17    Pretrial Services find out from law enforcement.  Okay?

18           You understand those conditions as I've gone

19    over them, sir?

20        DEFENDANT JENKINS:  Yes, sir.

21        THE COURT:  Okay.

22           Anything I missed from Pretrial?

23        PRETRIAL SERVICES OFFICER:  No, Your Honor.

24        THE COURT:  Okay.

25           So – and then, Ms. Misuria, thank you very much

1   for agreeing to serve as a third party custodian, and I said,

2   we all, obviously, want to make sure that your son follows

3   those conditions and that we're not back here before for a

4   violation of those conditions.

5          MS. MISURIA   Thank you.

6          THE COURT:   Okay.

7                Let me turn now to Mr. Mitchell.

8                Mr. Mitchell, let me just say upfront I do not

9   think there's a risk of flight.  He's a life-long Houstonian.

10  Yes, he's being charged with crimes that are extremely

11  serious, as I understand more than one crime.  I guess there's

12  another hearing set for tomorrow, but the fact that someone is

13  charged with crimes in my mind does not simply make them a

14  risk of flight, otherwise – that's not the law.  And if it

15  was – well, it's not the law.  Let me just say that.

16                The question is, is he a danger to the

17  community, and more importantly, has the Government shown by

18  clear and convincing evidence that there's no conditions or

19  combinations of conditions that I could impose to alleviate

20  that threat.

21                Look.  It's serious charges.  I know there's

22  sort of conflicts or confusion or a lack of clarity somewhat

23  on the weight of evidence.  I'll be blunt.  You know, I'm a

24  little torn when I read the – you know, he does have a

25  criminal history that causes some concern, but at the end of

1  the day, I don't think the Government has met its burden.  And

2  by that I mean, I think there are conditions I could impose

3  here to alleviate the threat.  It's not like I got a bunch of

4  situations in his past.  He served his time, and it's not

5  where I have a bunch that he's, you know, just flaunted the

6  rules or parole and violated conditions, ignored conditions.

7           So, I'm going to impose conditions on you, sir,

8  Mr. Mitchell, to be released, but as I said, I'm going to

9  impose pretty strict conditions.  And once again, you heard me

10 say it before but follow these conditions to a tee.  If there

11 is one iota of violation, you should expect to be back here

12 before – I'll look you in the eye; you'll look me in the eye,

13 and I'll say – you know – I told you so.  I don't want to do

14 it.  I know your lawyer doesn't.  No one wants that.

15           Understand sir?

16      DEFENDANT MITCHELL:  Yes, sir.

17      THE COURT:  Okay.

18      MR. PARADISO:  Your Honor, the Government asks for a

19 stay so we can file an appeal.

20      THE COURT:  That's – that's fine.

21      MR. ADLER:  Judge, if I could – we're going to be

22 here tomorrow anyhow, so he's not going to be able to be

23 released today.

24      MR. PARADISO:  We were still going to file a stay,

25 Your Honor.  That's it.

84

1          THE COURT:  Okay.  Well, let me – let me go – I'm

2  going to walk through the conditions.  Then, we'll – we'll –

3  we'll address that.

4          Okay.  Mr. Mitchell, I'm going to go through

5  these conditions.  You've heard some of them already, but it's

6  important for you to hear them from me.

7          Once again, you cannot any federal, state or

8  local law while on release, that you have to – you cannot

9  intimidate, attempt to intimidate a witness.  You can't

10  obstruct a criminal investigation.  Obviously, you have to

11  appear in court, surrender if you have a sentence imposed upon

12  you.

13          I'm going to impose a $50,000 unsecured bond.

14  If you violate the condition, you could be responsible for

15  paying $50,000.

16          You have to report to Pretrial Services.  If you

17  have a passport, you have to give it up.  You can't obtain

18  another passport.  You're to avoid all contact with any co-

19  Defendant, any victim or potential witness.

20          No possession of firearm, no excessive use of

21  alcohol.  You can't use, possess any narcotic drug.  That

22  includes no CBD use.

23          I'm going to require that you have an ankle

24  monitor on.  If you have any contact – I'm not sure why you

25  should given what I'm about to say – that you have to report

1    that to Pretrial Services, and I'm going to order home

2    incarceration.  So, you are going to be restricted to your

3    residence at all times, except for medical needs and treatment

4    and court appearances – basically, you can't leave the house

5    unless if there's a medical emergency obviously.  And if you

6    want to meet with your lawyer or you got a court appearance,

7    you need to get preclearance, that is, check ahead of time

8    with Pretrial Services.

9               So, don't just leave the house and say, oh, I

10   went to see Mr. Adler.  That's not going to work.  You've got

11   to talk to Pretrial Services ahead of time.

12              Do you understand that, sir?

13          DEFENDANT MITCHELL:  Yes, sir.

14          THE COURT:  Okay.

15              And then the one thing I'll throw out there –

16   and you mentioned this briefly, Mr. Adler – I'm not saying he

17   can't work or can't get a job.  I guess we'll sort of revisit

18   that later on.  In other words, if he – if he's interested in

19   applying for a job and gets some interviews, then let's come

20   back and we can talk about whether or not if he should or how

21   to structure that.  But at least right now I think that these

22   conditions would be – would be appropriate.

23              Okay.  Any questions for me?

24          DEFENDANT MITCHELL:  No.  Thank you.

25          THE COURT:  Okay.

1          The Government has requested a stay – oh, okay.

2   I mean, how long do you want?

3          MR. PARADISO:  Uh- --

4          THE COURT:  I mean, nothing – right, he's going to be

5   here tomorrow.  Nothing's happening tomorrow.

6          I don't know what's going to happen tomorrow.  I

7   have no idea what the – I have no idea what's going to happen

8   at the Detention Hearing tomorrow.

9          MR. ADLER:  I'm not trying to tell him what to do,

10  but it seems like tomorrow –

11         MR. PARADISO:  Your Honor –

12         MR. ADLER:  -- would be the better time to ask for

13  detention.

14         MR. PARADISO:  Yeah, Your Honor, we're okay.  As long

15  as he's staying in tonight for the hearing tomorrow.

16         THE COURT:  Obviously – yeah, we have another case

17  tomorrow.  I know there's three visits tomorrow, because I

18  don't know – I have no idea what's going to happen.

19         And let me be very clear, Mr. Mitchell.  I'm

20  ordering you being released on these charges based on today's

21  hearing.  I understand there's another hearing tomorrow.  I

22  have no idea what's going to happen to that hearing.  I have

23  no idea what the evidence is going to be.  I'm not going to

24  prejudge it in your favor or against you.  So, we'll just wait

25  and see what happens tomorrow, but obviously the Government

DIGITAL SCROLL TRANSCRIPTION                          281.382.9862

1  has indicated, which fully they're right of their desire to

2  appeal my decision, which they are obviously free – that's why

3  we have a great system.  Everyone can appeal to the higher

4  court.  So –

5                Okay.  So, now we turn – let me get my ducks in

6  a row – now we turn to Mr. Butler.  And once again in terms of

7  the risk of flight, I don't think the Government met its

8  obligation on the risk of flight.  I think the Pretrial Report

9  is clear that Mr. Butler was born in Houston, has been a life-

10 time resident here.

11               And I understand that – that's actually a pretty

12 good argument, but that – you know – given some violations

13 previously, maybe some non appearances, that creates the risk,

14 but at the end of the day that – I want to focus on the danger

15 issue, because I think that's really where the rubber hits the

16 road.

17               And, obviously, you know, there's testimony that

18 there were some statements made about brandishing a firearm,

19 willingness to use the weapon as part of a robbery, that he

20 gave orders to people, that you were the ring leader –

21 obviously, that all weighs into the decision, but to me it's

22 looking at the criminal history.  And once again, as I've said

23 over and over, it's not that someone has a criminal history.

24 Simply because you have a criminal history doesn't mean you

25 should be detained or held in custody on future incidents.

1        What concerns me has – what concerns I have here

2    is how many times, been on bond, have it revoked for various

3    things, whether it's failure to meet conditions, whether it's

4    a new law violation, failure to submit to a drug test, failure

5    to pay fees and court costs, failure to complete education

6    evaluation and program, failing to comply with curfew

7    requirements, failure to report to Pretrial Services, failure

8    to obtain and install GPS device – sort of a laundry list,

9    repeatedly.  It's not just as if it's one time.  It's over and

10   over.

11       And I understand – and, you know, Mr. Vinas  --

12   you got a very good lawyer; Mr. Vinas has made a very

13   persuasive argument that, hey, when that has happened at the

14   state level, then it's been put basically – bond has been put

15   back into effect.  But that – you know, I don't know what's

16   happened on the reasoning of those judges.  To me, it's just

17   incredibly concerning that given your alleged involvement and

18   given the strength of the evidence in this case, that we have

19   these repeated violations, which really causes me great

20   concern, and I have no confidence at the end of the stay that

21   you would comply with any obligations that I impose here

22   today.

23       So, I do believe the Government has met its

24   obligation to show by clear and convincing evidence that you

25   are a danger, and more importantly, that there's no conditions

1  or a combination of conditions that I could impose to

2  alleviate that.

3        As I say, I do not do this lightly.  I have

4  thought long and hard about it, and it is the exception rather

5  than the rule when I order detention.  But I do think in this

6  case detention is appropriate.

7        So, sir, I'm going to order that you be remanded

8  into the custody of the United States Marshals pending the

9  trial of this case.

10        So, with that said, is there anything else that

11  we need to address.

12      MR. ADLER:  I have one request, Judge.

13      THE COURT:  Yes, sir.

14      MR. ADLER:  If the Government could get me this –

15  it's an unusual circumstance that I'm here today, and I'm

16  going to be here tomorrow on another case – same Defendants,

17  same Prosecutors – if the Government could e-mail me the

18  proffer tonight it might save us some time tomorrow.

19      MR. PARADISO:  For tomorrow?

20      MR. ADLER:  Yeah, if possible.

21      MR. PARADISO:  And I apologize to the Court.  I'm new

22  here, and I didn't know.

23      THE COURT:  Absolutely.  I would appreciate that.

24      MR. PARADISO:  No, I'll talk to co-counsel.

25      THE COURT:  And in fact, send it to all counsel.

1          MR. PARADISO:  Okay.

2          THE COURT:  Just for convenience.  That makes – that

3   makes it easier.

4          MR. PARADISO:  For tomorrow, Your Honor?

5          THE COURT:  Yeah, for – for tomorrow.

6             Okay.  Anything else from the Government?

7          MR. PARADISO:  No.  No, Your Honor.

8          THE COURT:  Okay.

9             On behalf of the Defendants?

10         MR. ADLER:  No, Your Honor.

11         THE COURT:  Okay.

12            And just so we're clear, so, Mr. Gaither, we're

13   going to come back 1:30 on Wednesday, and where we will start

14   off is Detective Bock will be on the witness stand, and you'll

15   start cross examination and we'll then address your – your

16   client, Mr. Maxwell, at that time.

17         MR. GAITHER:  That's fine.

18            Thank you, Judge.

19         THE COURT:  Okay.

20            With that said, thank you all very much.

21            Have a good day.  You're all excused.

22         MR. PARADISO:  Thank you, Your Honor.

23      (Proceedings concluded at 2:53:19 p.m.)

24

25

DIGITAL SCROLL TRANSCRIPTION                         281.382.9862

```
 1                  IN THE UNITED STATES DISTRICT COURT

 2                 FOR THE SOUTHERN DISTRICT OF TEXAS

 3                          HOUSTON DIVISION

 4

 5       I, Linda Griffin, court approved transcriber, certify that

 6  the foregoing is a correct transcript from the official

 7  electronic sound recording of the proceedings in the above-

 8  entitled matter.

 9

10  /s/ Linda Griffin                    September 21, 2023
    Linda Griffin                             Date
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

DIGITAL SCROLL TRANSCRIPTION                           281.382.9862